IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

IN RE:      THADDEUS D. WILLIAMS             Case No. 09–36121–KRH
Chapter 13

              Debtor.

_____

SANDRA S. SPAIN and
TREADEGAR CONSTRUCTION, LLC,

             Plaintiffs,

v.                                  Adv. Proc. No. 10–03117

THADDEUS D. WILLIAMS and
MICHELE B. WILLIAMS,

             Defendants.

_____

## <u>MEMORANDUM OPINION</u>

      In this adversary proceeding the Court is asked to wind up the affairs of the Plaintiff Virginia limited liability entity, Treadegar Construction, LLC ("Treadegar")[1] and to distribute funds the Court has on deposit (the "Interpled Funds") to the holders of the interests in Treadegar.  To accomplish this request the Court must first determine what, if any, are the outstanding debts and obligations of Treadegar.  The parties to this adversary proceeding suggest that Treadegar owes various federal and state taxes, and they have identified two judgments that remain outstanding against the company.  The Court must also resolve how the remaining profits of Treadegar should be distributed after the liabilities of the company have been satisfied.

---

[1] Treadegar is styled in the caption of this adversary proceeding as one of the two plaintiffs, but it is more appropriately recast as a mere stakeholder and the object of the litigation.  Treadegar is not independently represented and its legal existence has been cancelled by operation of law by the Virginia State Corporation Commission for failure to pay its annual registration fee.  Va. Code § 13.1–1064 (2010).

Plaintiff Sandra S. Spain ("Spain") argues that she and Defendant Thaddeus Williams each hold a fifty percent interest in the company.  Thaddeus D. and Michele B. Williams (collectively, the "Williams") argue that Defendant Thaddeus D. Williams ("Thaddeus Williams") and John E. "Jes" Sprouse ("Sprouse")[2] are the members of Treadegar, with a 51% and 49% ownership interest respectively.

For the reasons set forth herein, the Court concludes that Thaddeus Williams and Spain each currently holds a 50% interest in Treadegar.  The Court finds that the tax liabilities to the Internal Revenue Service and the Commonwealth of Virginia are valid obligations of Treadegar. The Court has questions regarding the default judgment Donald Stokes was able to obtain against the company.  The Court is not able to find that the judgment held by Sprouse is a valid obligation of Treadegar, nor is it able to conclude that the valid debts that have been ascertained constitute or comprise the full extent of the company's outstanding obligations.

Treadegar is not itself the subject of a bankruptcy proceeding.  In order to determine the extent of Treadegar's valid liabilities, the Court will appoint a liquidating trustee to administer the Interpled Funds in accordance with this ruling.  Once the liquidating trustee has identified and satisfied all the valid outstanding liabilities of Treadegar and has otherwise wound up its business affairs, then the remaining funds should be distributed equally to the bankruptcy estates of Thaddeus Williams and Spain.

**Procedural Posture**

This adversary proceeding originated in the Circuit Court of the County of Prince George, Virginia, on March 13, 2007, as a civil action styled *Sandra S. Spain and Treadegar*

---

[2] Sprouse is not a party to this adversary proceeding.

*Construction, LLC v. Thaddeus D. Williams, Michelle B. Williams*,[3] and *The Haskell Company*,

Case No. CL07–000134 (the "State Court Action").   The Plaintiffs originally sought relief

against defendant The Haskell Company ("Haskell") to recover monies owed Treadegar for work

it had performed as a subcontractor for Haskell on one of its construction projects.   Williams and

Haskell timely filed answers to the complaint in the State Court Action.   Upon motion for

interpleader by Haskell, and by consent order entered April 28, 2008 in the State Court Action,

Haskell tendered a check to the state court in the amount of $99,578.00, which represented the

total amount Treadegar claimed it was due for the work it had performed as a subcontractor.

Thereafter, Haskell was dismissed from the State Court Action.

Each of the individuals who remained parties to the State Court Action separately sought

relief under the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*   Thaddeus Williams initially filed a

voluntary petition under Chapter 13 of the Bankruptcy Code in the United States Bankruptcy

Court for the Eastern District of Virginia, Richmond Division (the "Court") on November 7,

2007 (Case Number 07–34214).   As a result, litigation in the State Court Action was stayed by

operation of § 362(a) of the Bankruptcy Code.   A motion for relief from stay was filed in the

summer of 2009 to allow the State Court Action to proceed; relief was granted after multiple

hearings, and the State Court Action resumed.   The Chapter 13 case of Thaddeus Williams was

dismissed on September 17, 2009 for failure to make Chapter 13 plan payments.   Thaddeus

Williams filed a second Chapter 13 bankruptcy petition in this Court on September 21, 2009

(Case Number 09–36121).   A new motion for relief from stay was filed in the second Chapter 13

case requesting that the State Court Action be allowed to proceed, and an order granting relief

was entered on June 16, 2010.

---

[3] Defendant Michele Williams' first name was incorrectly spelled "Michelle" in the state court complaint.

But the entry of this order did not allow the State Court Action to resume. Spain had filed her own petition under Chapter 13 on October 19, 2009 (Case Number 09–36121)[4] which filing also had the effect of staying all litigation in the State Court Action. Relief from the automatic stay of § 362 of the Bankruptcy Code was never sought or obtained in Spain's Chapter 13 case. Finally, Michele Williams filed a Chapter 13 bankruptcy petition on February 12, 2010 (Case Number 10–30885). The commencement of this bankruptcy case had the effect of further staying the already stayed litigation in the State Court Action. All three of these Chapter 13 bankruptcy cases remain pending before this Court. On July 14, 2010, the Williams filed a Notice of Removal to remove the State Court Action to this Court. The Court denied a Motion for Abstention and Remand filed by Spain by order entered September 3, 2010. On November 23, 2010, the Court ordered that the monies interpled by Haskell, plus any interest accrued thereon, be transferred to the Clerk of this Court.[5]

Spain filed an amended complaint (the "Complaint") against the Williams in the removed action on December 6, 2010. The four-count Complaint alleged that Treadegar was never properly constituted as a limited liability company. The Complaint asserted that Spain was the real party in interest for purposes of apportioning the funds interpled by Haskell. The Complaint sought a declaration disregarding Treadegar as a legal entity and finding that Spain is the sole holder of any and all interests in Treadegar.[6] In the alternative, the Complaint requested that, if the Court did recognize Treadegar as a bona fide limited liability company, then the Court should

---

[4] Plaintiff Spain filed her bankruptcy petition as Sandra Stephenson Sprouse. At the time of writing, Plaintiff is married to but separated from Jes Sprouse. She will be referred to as Sandra Spain throughout this opinion for clarity.

[5] Due to the accrual of interest, $102,221.29 was transferred to the Clerk's Office and is currently being held awaiting disposition. This amount is what is referred to as the "Interpled Funds."

[6] Spain has filed numerous pleadings with the Court in which she has alleged that she and Williams each held a 50% interest in Treadegar. It would appear at this stage of the proceedings that Spain has abandoned any theory that she alone is the sole interest holder in Treadegar.

4

appoint Spain as trustee in liquidation or proceed with judicial dissolution. The Complaint also sought treble damages against the Williams for illegal combination to injure Spain's reputation, trade, business, or profession pursuant to Va. Code §§ 18.2–499, 500.[7]

Defendants timely filed an answer (the "Answer") to the Complaint in the removed action stating that Treadegar was a properly constituted limited liability company and denying that Spain was a party in interest. The Answer also denied that the Defendants had diverted any funds from Treadegar for their personal use and thus had not injured Spain. Defendants filed a counterclaim against the Plaintiffs with six counts alleging that (I) Sprouse was a necessary party to the action, (II) Spain did not have standing to bring suit, (III) Sprouse and Thaddeus Williams were the members of Treadegar, (IV) Sprouse breached his fiduciary duty to Treadegar, (V) Spain's actions resulted in a loss of business opportunity for Treadegar, and (VI) Sprouse and Spain conspired to injure Thaddeus Williams in his reputation, trade, or business (the "Counterclaim").

On January 13, 2011, Spain filed (i) a Motion to Dismiss the Counterclaim, (ii) a Motion for Partial Summary Judgment (for a declaration disregarding Treadegar as a legal entity), and (iii) a Motion for More Definite Statement and to Strike Non-Conforming Pleadings. A hearing was held on Spain's three motions on February 2, 2011, at which the Court denied the Motion for Partial Summary Judgment and granted the Motion to Dismiss the Counterclaim in part by dismissing Counts I, II, III, and IV.[8] On February 9, 2011, the Williams filed a Motion to Approve Request to File Complaint Against Third Party, seeking to file a third-party complaint

---

[7] Spain seems to have abandoned this claim for relief, as no evidence was included at trial to support the claim and counsel for Spain did not argue for any recovery based thereon.

[8] Orders on the rulings were entered February 25, 2011. The Motion for More Definite Statement and to Strike Non-Conforming Pleadings was withdrawn without prejudice at the conclusion of the hearing. Plaintiff then filed an answer to the remaining counts of the Counterclaim on March 4, 2011.

against Sprouse.  Hearing was scheduled on the motion for March 2, 2011.  The Court ruled at

the hearing that the motion was untimely, as trial of this adversary proceeding was scheduled to

begin in less than a month.[9]

Trial was conducted before this Court on March 29, 2011 (the "Trial").  The parties

presented the testimony of seven witnesses and introduced numerous exhibits.  At the conclusion

of the Trial, the Court directed counsel to simultaneously submit proposed findings of fact and

conclusions of law.  The parties then presented arguments at a hearing conducted on May 17,

2011.  This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law

in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52 of the

Federal Rules of Civil Procedure.[10]

### Jurisdiction

The Court has subject matter jurisdiction of this adversary proceeding pursuant to 28

U.S.C. §§ 157(a), 1334, and 1452(a) and the general order of reference from the United States

District Court for the Eastern District of Virginia dated August 15, 1984.  This is a core

proceeding under 28 U.S.C. § 157(b)(2)(A), (O) as the interests in Treadegar are property of the

bankruptcy estates of Thaddeus Williams and Spain.  Venue is appropriate in this Court pursuant

to 28 U.S.C. § 1409(a).

### Facts

Thaddeus Williams and Jes Sprouse agreed to form a construction company after having

worked together on a number of construction projects around the Richmond, Virginia area.  On

May 5, 2006, Thaddeus Williams filed Articles of Organization with the Virginia State

---

[9] The order denying the Motion to Approve Request to File Complaint Against Third Party was not entered until April 11, 2011.

[10] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  *See* Fed. R. Bankr. P. 7052.

Corporation Commission (the "SCC") for the formation of Treadegar Construction, LLC.  The Articles of Organization listed Thaddeus Williams as the Organizer of Treadegar and Jes Sprouse as the company's initial registered agent.  The Articles of Organization identified Sprouse as a resident of Virginia and "a member or manager of the limited liability company."  On May 10, 2006, the SCC issued a Certificate of Organization for Treadegar.  Treadegar did not have an operating agreement.

On May 12, 2006, Sprouse, acting in the capacity of the "Operations Manager" of Treadegar, submitted a subcontractor's bid on behalf of Treadegar to Haskell for roofing work at the Covenant Woods Fire Restoration project site ("Covenant Woods") in Mechanicsville, Virginia.  On June 26, 2006, Haskell sent Treadegar, care of Sprouse, a letter of intent to enter into a subcontract for work at Covenant Woods.[11]  The subcontract contemplated that Treadegar would install the roof truss system and perform the bracing and sheathing work on the building at Covenant Woods.  On July 24, 2006, Treadegar and Haskell entered into a formal Subcontract Agreement at Covenant Woods in the amount of $171,000.00 (the "Original Subcontract").  John Brendel ("Brendel"), Director at Haskell, testified that at the inception of this Original Subcontract he believed that Sprouse and Thaddeus Williams were the two members of Treadegar.[12]

---

[11] Thaddeus Williams ended up signing the letter of intent, agreeing on behalf of Treadegar to the subcontract in principle.

[12] Under direct examination by Defendants' counsel, Mr. Brendel testified as follows:
"Q: Do you believe that you know who the owners of the company are?
[Objection overruled]
A: I believe I know who the owners of the company are, as constituted now.
Q: Okay.  And who do you think they are now?
A: According to the documents I've received, the court papers, it is Mr. Williams and Ms. Spain.
Q: And who did you believe it was before you received the court papers?
A: At the inception of the subcontract, my understanding was it was Mr. Williams and Mr. Sprouse."
Transcript of Record at 163–64.

On August 21, 2006, David Clark ("Clark"), Haskell's Project Manager at Covenant Woods, forwarded to Treadegar a modification to the Original Subcontract reducing the contract amount to $161,000.00, removing the crane rental from the original agreement, and altering the contract schedule (the "Modified Subcontract").[13]  Both Sprouse and Thaddeus Williams signed the Modified Subcontract on behalf of Treadegar on August 22, 2006.  According to the Modified Subcontract, mobilization at Covenant Woods was to begin August 22, 2006, with the first truss installation scheduled to commence August 24, 2006.

In anticipation of Treadegar's performance of the Modified Subcontract, the individual parties, together with Sprouse, opened bank accounts, acquired insurance, and rented construction equipment.  Treadegar opened two deposit accounts with SunTrust Bank, one with an account number ending in 1763 ("Account 1763") and another with an account number ending in 6864 ("Account 6864").[14]  A Deposit Account Resolution lists four individuals with authority to access Account 1763 and to act on Treadegar's behalf: Thaddeus Williams, Jes Sprouse, Michele Williams, and Sandra Spain.  Thaddeus Williams and Sprouse signed the resolution on August 10, 2006, while Michele Williams and Sandra Spain signed the resolution on August 11, 2006.  Each of the four is listed on the Business Account Signature Card for Account 1763, with Spain certifying that Treadegar's tax identification number was correct.

On July 25, 2006, Treadegar entered into a worker's compensation insurance agreement (the "Insurance Agreement") with BB&T G.C. Wright Insurance ("BB&T").  Sprouse contacted Kelli Payne of BB&T about acquiring coverage, and then accompanied Thaddeus Williams to a

---

[13] As a new start-up company, Treadegar did not have sufficient working capital to rent a crane, so Haskell agreed to supply a crane for Treadegar to use on the Covenant Woods site and reduce the amount of the subcontract accordingly.

[14] No documents were introduced by any party evidencing the creation of the Treadegar deposit Account 6864. However, documents were produced showing that Spain closed the two SunTrust accounts in the name of Treadegar, Account 1763 and Account 6864, on October 26, 2006. *See infra*.

meeting with Ms. Payne.   The Insurance Agreement covered both Sprouse and Thaddeus Williams as the officers of Treadegar.  While Sprouse and Thaddeus Williams were both present at the meeting with Ms. Payne, only Thaddeus Williams signed the Insurance Agreement. Treadegar also acquired a general liability policy with BB&T (together with the Insurance Agreement, the "Insurance Policies").  Shortly after acquiring the Insurance Policies, Treadegar issued a Safety and Health Program for use at the Covenant Woods site.  The document associated with the Safety and Health Program listed Thaddeus Williams as President and Sprouse as General Manager.  This was consistent with the business cards that Thaddeus Williams and Sprouse had had printed for Treadegar.

Treadegar needed to obtain construction equipment to begin work at the Covenant Woods site.  However, Treadegar lacked sufficient working capital to do so.  On August 22, 2006, Spain issued a personal guaranty on the continued credit of Treadegar to Volvo Rents.   Treadegar rented a telehandler and a manlift[15] from Volvo Rents; Haskell supplied the crane that Treadegar needed at the Covenant Woods worksite.  Spain allowed Sprouse to use her credit card to rent and to purchase other tools and equipment on Treadegar's behalf.

With insurance coverage in place and the necessary equipment secured, Treadegar began work at the Covenant Woods site on or around August 23, 2006.  Sprouse initially served as the foreman of Treadegar's crew, overseeing between 6 and 10 employees on site.  The truss work proceeded apace, as Treadegar received draws on the Modified Subcontract balance on or about September 20, 2006 and on or about October 4, 2006.[16]  Sprouse and Thaddeus Williams came to the job site daily, although Sprouse occasionally arrived late and left early.  Spain and Michele

---

[15] A telehandler is a forklift with an extendable boom.  A manlift is also known as a scissor lift.

[16] Treadegar requested payment on August 31, 2006 for $27,828.00 and on September 22, 2006 for $30,132.00, respectively.  Thaddeus Williams signed the first requisition statement, Sprouse signed the second.

Williams were present at the job site only "on some days."  Spain and Michele Williams frequently wrote checks for payroll and other expenses drawn upon the Treadegar deposit accounts.[17]  Spain wrote payroll checks for the workers Sprouse brought with him to work on the construction project, and Michele Williams wrote checks for the workers Thaddeus Williams brought with him to Covenant Woods.  The parties and their employees made steady progress on the site work.  There was never any dispute with Haskell over the quality of the work Treadegar performed at Covenant Woods.

On October 15, 2006, Spain abruptly sent a Revocation of Guaranty to Volvo Rents, revoking her personal guaranty for the equipment rented in August 2006.  On the same day, Spain sent a Demand for Tools and Equipment to Treadegar, attention to Sprouse, demanding the immediate return of all tools and equipment she had loaned to Treadegar.  Around this time, Spain retained attorney Donald Stokes to represent her and Treadegar.  Mr. Stokes sent a letter to Haskell representatives Clark and Brendel dated October 22, 2006 advising them that Spain and "the co-owner, Thaddeus Williams" were unable to resolve their differences regarding Treadegar.  In the letter, Mr. Stokes also noted he understood that Sprouse would remain as the Operations Manager for Treadegar at Covenant Woods in order to complete the project and that final payment on the Modified Subcontract would be wired to Treadegar's bank accounts.

On October 25, 2006, Sprouse abandoned any further work at the Covenant Woods job site.  He took all but one of Treadegar's workers with him; only Joseph Brown remained with Thaddeus Williams to complete the work at Covenant Woods.  Sprouse returned once within the following week to pick up personal tools that remained at the site.  On October 26, 2006, Spain closed both of Treadegar's deposit accounts at SunTrust, withdrawing the remaining balances of

---

[17] Neither Michele Williams nor Spain was ever a formal employee of Treadegar, although each of them frequently performed clerical work for the company.  Neither was compensated for any of the work that was performed.

$190.11 and $32.50 in the process.  In a letter dated November 1, 2006, Thaddeus Williams advised Brendel at Haskell that he was "involved in a dispute with Jes Sprouse" regarding Treadegar's bank accounts and requested that no money for Treadegar be wired to "any account designed by either Jes Sprouse or Sandra Spain."

After the departure of Sprouse and his crew of workers, Thaddeus Williams remained at Covenant Woods to complete the project.  Mr. Williams continued to employ Joseph Brown and eventually hired one additional worker.   The project was finally completed on or about December 16, 2006.   Brendel testified that he and Haskell were satisfied with the finished product.  Haskell then withheld distribution of the balance owed to Treadegar on the Modified Subcontract pending a resolution of the disputes amongst the Williams, Sprouse, and Spain. After completion of the Treadegar contract, Thaddeus Williams performed other work for Haskell at the Covenant Woods site unrelated to the Modified Subcontract under the name Williams Construction Services, LC.   Haskell hired Williams Construction Services, LC as a subcontractor to perform trim work on the building in spite of Messrs. Clark and Brendel's knowledge of the ongoing internal disputes at Treadegar.  Treadegar was cancelled by operation of law by the SCC on December 31, 2007 for failure to pay its annual registration fee.

Irrespective of the disputes as to ownership of and membership in Treadegar, Spain and Thaddeus Williams each contributed significant amounts of money to fund the operations of Treadegar at Covenant Woods.  Spain produced records at Trial accounting for approximately $36,970.00 in expenses related to Treadegar.  Spain had incurred additional expenses totaling several thousand dollars for which she previously had been reimbursed.  The Treadegar expenses funded by Spain included gasoline, payroll checks, food, materials, and supplies for construction work.  Sprouse frequently used Spain's credit card to make these purchases for Treadegar, and

he also requested checks to finance payroll and other Treadegar obligations based on his personal receipts and time log. Records indicate that $22,174.10 of the unreimbursed expenses that Spain incurred arose from costs incurred by Sprouse after October 25, 2006, the day Sprouse left the Covenant Woods job site. Thaddeus Williams produced records detailing $14,272.63 in expenses related to Treadegar. Thaddeus Williams' expenses also included construction materials and supplies as well as advances for payroll and insurance premiums.

Despite the financial contributions made by Spain and Thaddeus Williams, Treadegar has debts and liabilities that remain outstanding. Treadegar owes a combined total of at least $9,255.90 in taxes to the Commonwealth of Virginia and the Internal Revenue Service, plus any interest and penalties thereon.[18] In addition, on October 1, 2010, attorney Donald Stokes obtained a default judgment in the Circuit Court of the City of Hopewell, Virginia against Treadegar in the principal amount of $43,722.08. Mr. Stokes filed a Notice of Attorney's Lien in the Circuit Court of the County of Prince George, Virginia, and gave notice to Sprouse, Spain, and the Williams. Finally, Sprouse obtained a default judgment against Treadegar on a Warrant in Debt from the Chesterfield County General District Court on August 27, 2010 in the amount of $14,740.00 plus $56.00 in costs. Sprouse claimed he was owed back wages and a truck allowance; however, the Court did not find Sprouse's testimony in these regards to be credible. The Warrant in Debt was served by the sheriff on the defendant Treadegar at the address

---

[18] The parties agree that Treadegar owes $398.96 in federal unemployment taxes plus $5,702.76 in federal withholding taxes to the IRS and $1,363.52 in state unemployment taxes plus $1,790.66 in state withholding taxes to the Commonwealth of Virginia. Thaddeus Williams filed Forms 940 and 944 with the IRS in 2009 correcting previous returns he filed for Treadegar for employment and unemployment taxes owed. No account was given for the amount of the State franchise tax that was not paid. The Court has no record that any income tax returns were ever filed by Treadegar. The Court has no record that any personal property taxes or business license fees were ever paid by Treadegar. The Court is not aware that the company was ever issued a state contractor's license.

provided by plaintiff Sprouse—Sprouse's current home address, which doubled as the address on

file for Treadegar's registered agent.[19]

## Analysis

Three main issues are before the Court in this case.  First, who were the members of

and/or the interest holders in Treadegar?  Second, what are the legitimate debts and obligations

of Treadegar and to whom should they be paid?  Third, how are the profits and losses of

Treadegar to be distributed; in other words, how will Treadegar be wound up?

In addition, the Court is asked to consider the claims in Defendants' counterclaim that

Sprouse and Spain conspired to injure Thaddeus Williams in his reputation, trade, or business,

and caused Treadegar a loss of business opportunity by their actions.

### I

From its inception, Treadegar, as a limited liability company, was dysfunctional.  Only

the most minimal of organizational formalities were ever observed.  Nevertheless, Treadegar was

a properly constituted limited liability company.  Under the Virginia Limited Liability Company

Act, "[t]he certificate of organization shall be *conclusive evidence* that all conditions precedent

required to be performed by the person(s) forming the limited liability company have been

complied with and that the limited liability company has been formed under this chapter."  Va.

Code. § 13.1–1004(B) (2010) (emphasis added).  The parties do not dispute that the SCC issued

a Certificate of Organization for Treadegar on May 10, 2006.  Treadegar was issued a taxpayer

identification number.  It entered into contracts with third parties.  The Court concludes that

---

[19] Sprouse had previously changed the address of Treadegar's registered agent—himself—on two occasions.  On February 25, 2007, he moved the address from Petersburg, Virginia to Spring Grove, Virginia.  Then, on July 28, 2010, Sprouse moved the address from Spring Grove to Chester, Virginia.  In each case, Sprouse filed paperwork with the SCC indicating that he, as the current registered agent, was a "member or manager of the limited liability company."

Treadegar was a valid limited liability company formed under Virginia law and it will not simply disregard its corporate existence.

In operation, Treadegar functioned more like a partnership than it ever did a limited liability company.  Sprouse and Thaddeus Williams each brought their own work crews to Covenant Woods.  They each separately paid their own workers.  Sprouse enlisted the financial support of Spain to fund the venture.  Spain oversaw all of Sprouse's financial transactions with Treadegar.  While Thaddeus Williams was aware of Spain's financial contributions, he denies that she played any formal role in the company.  Thaddeus Williams entrusted his wife, Michele Williams, with managing his work expenses.  Sprouse and the Williams kept separate work logs. Each of Sprouse and Thaddeus Williams stored their company documents in their respective homes.  Sprouse eventually left Covenant Woods, taking his crew of workers with him; Thaddeus Williams remained on site with his worker until completion.  For all intents and purposes, Sprouse and Spain appear to have operated as one business venture and the Williams appear to have operated as another, with each venture separately using Treadegar as a vehicle to secure construction work for its respective business enterprise.

Virginia law would appear to require member-managed limited liability companies to have at least one member.  The Virginia Limited Liability Company Act specifies that "management of a limited liability company shall be vested in its members" unless "the articles of organization or an operating agreement provides" that it be managed by a manager.  Va. Code. § 13.1–1022 (2010).  Thaddeus Williams filed Treadegar's Articles of Organization as organizer and named Sprouse as the registered agent on the document.  The Articles of Organization did not list any managers for Treadegar.  Furthermore, Treadegar did not have an operating agreement.  As Virginia law dictates that the management of a limited liability company without

14

an operating agreement "be vested in its members," one or more members of Treadegar must exist.

Virginia law provides surprisingly little guidance in how membership in a limited liability company should be determined. The articles of organization or an operating agreement can define the membership in the company. *See* Va. Code §§ 13.1–1022, 1023, 1038.1 (2010). Moreover, Va. Code § 13.1–1038.1 provides several methods by which members may be admitted to a limited liability company. Individuals acquiring a membership interest from the limited liability company itself become members upon compliance with the terms of the operating agreement or by a majority vote of the members in a member-managed limited liability company without an operating agreement (such as Treadegar). Va. Code § 13.1–1038.1(1) (2010). If a limited liability company had no members at its commencement, membership can be determined in "any writing signed by both the initial member or members and the managers, if any are designated in the articles of organization, or, if no managers are so designated, the organizers." Va. Code § 13.1–1038.1(3) (2010).

Treadegar did not comply with any of these statutory provisions. While the Articles of Organization list Thaddeus Williams as Treadegar's organizer, Virginia law provides that "[organizers] need not be members of the limited liability company after formation has occurred." Va. Code § 13.1–1010 (2010). Treadegar did not have an operating agreement, and there is no evidence that a majority of members (whoever they may be) ever voted any other individual into membership. Even if it is assumed that Treadegar had no members at its commencement, no writing exists signed by both the organizer (Thaddeus Williams) and any initial member. The document that most closely resembles such a writing is the Insurance

Agreement, which lists Thaddeus Williams and Sprouse as each owning 50% of Treadegar. However, only Thaddeus Williams signed the Insurance Agreement.

Accordingly, the Court must turn to extrinsic evidence to determine the membership of Treadegar.  Although Virginia law clearly requires membership in a member-managed LLC, the statutes simply do not provide a method for determining members in a properly constituted limited liability company that does not adhere to any of the organizational formalities.  With the statute silent on the subject, "[t]he acts and conduct of the parties may constitute sufficient evidence of a person's status as a shareholder or member."  18A Am. Jur. 2d *Corporations* § 738 (1985); *see also Tarsney Lakes Homes Ass'n, Inc. v. Joseph*, 620 S.W.2d 8 (Mo. Ct. App. 1981) (finding participation in corporation activities, meeting attendance, and service as a director to be sufficient evidence of corporate membership); *Krosnar v. Schmidt Krosnar McNaughton Garrett Co.*, 423 A.2d 370 (Pa. Super. Ct. 1980) (holding that the listing of an individual on an amendment to the articles of organization coupled with the treatment of the individual as a shareholder was sufficient evidence of shareholder status).

The cumulative evidence before the Court indicates that Thaddeus Williams and Sprouse were the two initial members of Treadegar.  The parties do not disagree that Thaddeus Williams is and has always been a member of Treadegar.  His status as Treadegar's organizer, while not conclusive, is evidence supporting his membership.  He signed numerous documents binding the company and he incurred significant expenses on the company's behalf.  Thaddeus Williams filed tax returns for the company.  He held himself out as the President of Treadegar.

Despite Spain's assertions to the contrary, Sprouse appears to have been the other initial member of Treadegar.  Sprouse was listed as the registered agent on the Articles of Organization, and later personally filed several forms with the SCC unilaterally changing the address of record

16

for the registered office.  In each of these subsequent filings, Sprouse indicated that he, as the current registered agent, was a "member or manager of the limited liability company."  Sprouse was listed in the Insurance Agreement as the Operations Manager and as a 50% owner of Treadegar.  While Sprouse did not sign the Insurance Agreement, he was present with Ms. Payne when Thaddeus Williams signed it.   Furthermore, Sprouse signed the Deposit Account Resolution with SunTrust Bank in the capacity as a Manager of Treadegar.

In addition to this documentary evidence of membership, Sprouse held himself out as the manager of Treadegar on numerous occasions.  Mr. Brendel understood from his interactions with Sprouse and Thaddeus Williams on the Covenant Woods construction project that they were the co-owners of Treadegar.  Sprouse distributed business cards that named him as the General Manager of Treadegar.  He contacted Ms. Payne at BB&T about acquiring worker's compensation insurance for Treadegar.  Sprouse submitted Treadegar's subcontract bid to Haskell for the Covenant Woods project in the capacity of manager.  He also executed the Modified Subcontract on behalf of Treadegar.  Nearly every contemporaneous document and action during Treadegar's early existence indicates that Sprouse was its initial manager.  Absent an operating agreement appointing Sprouse as manager of Treadegar, the only way that Sprouse could have functioned as a manager of Treadegar was as a member-manager.  Va. Code § 13.1–1022(A) (2010).  Finally, Thaddeus Williams testified that Sprouse was the other member of Treadegar.  The Court can only conclude that Sprouse must have been a member of Treadegar along with Thaddeus Williams.[20]

---

[20] The Court is aware that Sprouse signed an affidavit, dated January 13, 2011, wherein he declared that he was not and had never been a member or manager of Treadegar Construction, LLC.  The Court finds the affidavit pertinent as evidence of Sprouse's later repudiation of his membership, *infra*, but does not find it credible evidence that Sprouse never was a member of Treadegar.  The affidavit was signed almost 4 years after the litigation began and the Court does not find Sprouse to be a credible witness.

The Court finds, therefore, that Thaddeus Williams and Sprouse were the initial members of Treadegar and that each held a 50% interest in the company. The only written evidence before the Court on this latter point is the Insurance Agreement which clearly lists Thaddeus Williams and Sprouse as each holding a 50% ownership stake in Treadegar. Furthermore, the Court finds that Spain was not an initial member of Treadegar. Although Spain signed the Deposit Account Resolution as a Vice-President of Treadegar and endorsed the Business Account Signature Card to certify Treadegar's tax identification number, Michele Williams also signed the Deposit Account Resolution as a Vice-President, and no party asserts that she was a member of Treadegar.

The testimony at Trial on the issue of membership in Treadegar was not entirely conflicting. In point of fact, the testimony is capable of being reconciled. The parties all agree that there are two members of Treadegar.[21] The disagreement centers on who those members are. Spain testified that she and Thaddeus Williams are the members of Treadegar. Thaddeus Williams denies that Spain is a member. Thaddeus Williams insisted that he formed the company with Sprouse, and that he and Sprouse were the members of Treadegar. Sprouse denies that he is a member. He insists that Spain, and not he, is the other member of Treadegar along with Thaddeus Williams. The Court can only surmise that Spain must have acquired Sprouse's interest in Treadegar from Sprouse at some point. Sprouse testified that he advised Spain that she and Thaddeus Williams were the members of Treadegar. Spain behaved as if she were a member of Treadegar. Spain provided her personal guaranty to Volvo Rents in order to procure the construction equipment the company needed for and used on the Covenant Woods construction project. Spain contributed other capital to Treadegar as well. Thaddeus Williams was fully aware of Spain's personal guaranty as well as her financial contributions. Sprouse,

---

[21] *See supra* note 6.

meanwhile, invested no money in Treadegar.  Sprouse testified that the company could not have operated but for Spain's significant financial involvement.  Clearly, Sprouse led Spain to believe that she was a member of Treadegar.  It is hard to fathom that Spain would have made the significant financial contributions that she did to Treadegar unless she believed she had a financial stake in the enterprise.  Spain's firm belief is evidenced by her retention of Mr. Stokes on behalf of Treadegar who in turn mailed a letter to Haskell indicating that Spain and Thaddeus Williams were each 50% owners of Treadegar.  Spain also commenced the State Court Action on behalf of Treadegar and was able to recover the Interpled Funds from Haskell on behalf of Treadegar.

Under the Virginia Limited Liability Company Act, "a membership interest in a limited liability company is assignable in whole or in part," unless the articles of organization or operating agreement prohibit assignment.  Va. Code § 13.1–1039(A) (2010).  No operating agreement existed for Treadegar, and the Articles of Organization did not include an explicit limitation on assignment.  The court finds that Sprouse assigned his membership interest in Treadegar to Spain at some point in July 2006 in order to secure Spain's financial commitment to the company.  Such an assignment is consistent with the representations Sprouse made to Spain about her membership in Treadegar that prompted Spain to expend the significant sums that she did to fund Treadegar's activities.  Such an assignment is not inconsistent with Sprouse's later repudiation of his membership interest in Treadegar.  It is also entirely consistent with the testimony of Brendel at Haskell.[22]

Finding an assignment of the membership interest does not conclude the analysis.  The Virginia Limited Liability Company Act restricts the assignment of membership interests in limited liability companies:

_____

[22] *See supra* note 12.

An assignment does not entitle the assignee to participate in the management and affairs of the limited liability company *or to become or to exercise any rights of a member*.   Such an assignment entitles the assignee to receive, to the extent assigned, only any share of profits and losses and distributions to which the assignor would be entitled.

Va. Code § 13.1–1039(A) (2010) (emphasis added); *see also In re Garrison-Ashburn, L.C.*, 253 B.R. 700, 706 (Bankr. E.D. Va. 2000) ("[A] Virginia limited liability company [does] not possess the corporate attribute of free transferability of interests.").   A limited liability company may verify the assignment of a full membership interest by the issuance of a certificate of interest to the assignee; however, no such certificate was issued to Spain.   Va. Code § 13.1–1039(B) (2010).

Therefore, Spain acquired Sprouse's share of profits and losses in Treadegar, as well as the right to any distributions from Treadegar to which Sprouse would have been entitled.   But Spain did not acquire all of the rights of a member in Treadegar.   Nor did she acquire a membership interest directly from Treadegar, as Thaddeus Williams (the only other member) never gave his consent.   Va. Code § 13.1–1038.1(1) (2010).   Spain, as assignee, did not become a member of Treadegar.   The statute specifically provides that "an assignee of an interest in a limited liability company may become a member . . . *only* by a majority vote of the members (other than the assignor member) of any other limited liability company" other than a manager-managed LLC.   Va. Code § 13.1–1040(A) (2010).   Thaddeus Williams never voted to admit Spain to membership in Treadegar.

In summary, Thaddeus Williams and Sprouse were the initial members of Treadegar.   At some point in July 2006, Sprouse caused his membership interest in Treadegar to be assigned to Spain.   Sprouse later renounced any remaining interest in Treadegar.   As assignee, Spain

acquired the rights to Sprouse's share of Treadegar's profits and losses, but she did not acquire the full rights of membership.

II

Having determined that Thaddeus Williams and Spain are the holders of interests in Treadegar, the Court is next asked to determine the outstanding, valid obligations of Treadegar so that after the payment of same, the remaining profits from the Covenant Woods job can be distributed to the interest holders.

The parties have identified a limited number of outstanding debts of Treadegar. First, Treadegar owes unemployment and withholding taxes to both the IRS and the Commonwealth of Virginia, totaling $9,255.90.[23] Second, Mr. Stokes obtained a judgment against Treadegar and has asserted an attorney's lien on Treadegar's assets in the amount of $43,722.08. Third, Sprouse obtained a default judgment on a Warrant in Debt from the Chesterfield County General District Court in the amount of $14,740.00 plus $56.00 in costs against Treadegar after serving only himself as Treadegar's registered agent.

The Court cannot conclude that these enumerated liabilities are the only legitimate liabilities of Treadegar. The Court does find that Treadegar owes the IRS and the Commonwealth of Virginia at least $9,255.90, although there is no evidence to suggest that either the IRS or the Commonwealth of Virginia agree with these figures. However, there may be other tax liabilities outstanding. The Court notes that Mr. Stokes appears to have a claim in the amount of $43,722.08 by virtue of the default judgment he obtained against the company. However, this debt was contracted by Spain, and she may be personally liable for it. The default judgment was obtained through service of process on Sprouse who was married to Spain at the time. Spain made no effort to contest the claim at Trial and, in fact, advocated for its payment.

---

[23] For a full breakdown, see *supra* note 18.

Problems with the judgment Sprouse obtained are more clearly evident on the record.  In fact, Treadegar may not owe any money to Sprouse as it would appear that the judgment he obtained on his Warrant in Debt is void.

Sprouse obtained his judgment against Treadegar on a Warrant in Debt after the defendant, Treadegar Construction LLC, failed to answer the Warrant in Debt.  The failure of Treadegar to respond to the Warrant in Debt should not be altogether surprising.  Treadegar was served only via its registered agent, Jes Sprouse, who simply happened (in a happy coincidence) to be the plaintiff in the Warrant in Debt action.

Virginia courts have long refused to accept such brazen departures from the principles of due process.  In *Beck v. Semones' Administrator*, the Supreme Court of Virginia faced a scenario where the president of a company, Beck, initiated an action against his own company.  *Beck v. Semones' Adm'r*, 134 S.E. 677, 145 Va. 429 (1926).  The company had purchased two tracts of land, then defaulted; thereafter, the seller initiated a suit against the company.  *Id.*, 134 S.E. at 678, 145 Va. at 433–34.  In order to obtain priority over the seller's impending judgment and to protect his own investment in the company,[24] Beck initiated a suit against the company and obtained a judgment.[25]  *Id.*, 134 S.E. at 678–79, 145 Va. at 435.  The seller challenged the validity of the president's judgment in a collateral attack questioning whether the trial court had jurisdiction to enter judgment against the company due to questions about the service of process. The Supreme Court of Virginia noted:

> When an officer of a corporation, either in his own right or as agent for another, sues the company of which he is the officer, he abandons for the occasion his

---

[24] The company president and the company treasurer, who was deceased at the time in question, were the only stockholders of the company.  *Beck*, 134 S.E. at 678, 134 Va. at 433.

[25] The president ensured that a personal representative was appointed for the company's only other stockholder, the treasurer, who then obtained a similar judgment against the company.  *Id.*, 134 S.E. at 679, 134 Va. at 436. Accordingly, all of the owners of the company or their duly appointed representatives were aware of the actions against the company and were plaintiffs in respective suits against the company.

> position as officer and cannot commence an action against the company by
> service of process upon himself as officer. *This would be simply service of
> process upon the plaintiff instead of upon the defendant.* If this could be done and
> the judgment rendered thereon could not be collaterally assailed, it would open
> the door to the grossest fraud, and subvert the orderly administration of justice.
> Where the relation of the officer served to the plaintiff is such as to make it to his
> interest to suppress the fact of service, service cannot be made upon such officer,
> although he is within the terms of the statute designating those upon whom
> service may be made.

*Id.*, 134 S.E. at 679, 145 Va. at 437–38 (emphasis added).  The court further noted that "[i]f

[service was] invalid, then the court never acquired jurisdiction of the defendant, and the

judgment was void."  *Id.*, 134 S.E. at 680, 145 Va. at 441; *see also Garritty v. Va. Dep't of Soc.

Servs. ex rel. Sinift*, 396 S.E.2d 150 (Va. Ct. App. 1990) ("Judgments . . . with service of process

in a manner not authorized by law, are void judgments.").  The Supreme Court of Virginia

ultimately concluded that the trial court's jurisdiction could not be collaterally attacked because

"no want of jurisdiction [was] apparent of record."  *Beck*, 134 S.E. at 681, 145 Va. at 442.  While

the court conceded that Beck may have intentionally deceived the trial court by "the unusual

course of omitting the name of the president of the defendant company" from the pleadings, the

Court concluded that the lack of jurisdiction was not apparent on the face of the pleadings and

the case was fully and fairly adjudicated on its merits.   Therefore, the court ultimately

determined that a collateral attack on jurisdiction was inappropriate.  *Id.*, 134 S.E. at 682, 134

Va. at 445.

    In contrast, the "want of jurisdiction" was blatantly apparent on Sprouse's Warrant in

Debt before the Chesterfield County General District Court.  When completing the Warrant in

Debt on August 6, 2010, Sprouse listed himself as the plaintiff and provided his home address.

He next listed Treadegar Construction, LLC as the defendant and then again gave his home

address as the address of the company.  Furthermore, on the very next line, Sprouse listed

23

himself as registered agent for Treadegar.  On August 11, 2010, the sheriff attested to personal service on the name and address listed by Sprouse.  Judgment was granted, not on the merits after full and fair adjudication, but by default on August 27, 2010 when the defendant failed to appear on the return date.

In direct contravention of principles of due process and simple common sense, Sprouse obtained a judgment against Treadegar without any other representatives of the company being made officially aware.  The defects of this judgment are apparent from the face of the Warrant in Debt—Sprouse is listed, by name and by address, as both plaintiff and registered agent of the defendant.  As the lack of the general district court's jurisdiction is clear, the judgment obtained would appear to be void.  That Sprouse was the duly designated registered agent of Treadegar and therefore statutorily permitted to receive process on the company's behalf is of no consequence.  The Supreme Court of Virginia has made clear that such actions "subverted the orderly administration of justice."  It would appear that Treadegar does not owe the amount of $14,740.00 plus $56.00 in costs to Sprouse on account of the default judgment Sprouse obtained against Treadegar.

The Court now turns to the claims of Treadegar's two interest holders.  Both Spain and Thaddeus Williams presented voluminous exhibits detailing expenses they incurred in funding Treadegar's operations.  The Court need not parse these records, as it has determined that Thaddeus Williams and Spain each retain a 50% interest in Treadegar, at least as to the distribution of profits and responsibility for liabilities.  No formal debt instruments document Treadegar's liability for these expenses; nor do Treadegar's books and records reflect any indebtedness owed to its interest holders.  As the interest holders in Treadegar, these "expenses" that Spain and Thaddeus Williams incurred should be treated as the amounts each party supplied

in order to fund the success—or failure—of the business venture.  The Court will characterize

the expenses as contributions to the capital of Treadegar.  *In re Dornier Aviation*, 453 F.3d 225,

231 (4th Cir. 2006) ("In light of the broad language of § 105(a) and the larger purpose of the

Bankruptcy Code, we believe that a bankruptcy court's power to recharacterize is essential to the

proper and consistent application of the Code.").  Any difference that may exist in the precise

amounts contributed by Thaddeus Williams and Spain to Treadegar are relatively insignificant;[26]

and, in the final analysis, any such differences are irrelevant to the ultimate distribution of the

Interpled Funds.  The Interpled Funds are the monetary result of Treadegar's operations, and

they must be distributed to Treadegar's holders in interest in proportion to the holders' respective

shares of the company.  As each of the two interest holders has a 50% interest in the profits and

losses of Treadegar, the remainder of the Interpled Funds, after the valid debts of Treadegar have

been paid, should be distributed to Treadegar's two interest holders in equal proportion.

### III

The Court now turns to the proper method for winding up Treadegar and distributing the

Interpled Funds.  The company is no longer operating and the parties have requested the Court to

proceed with judicial dissolution.  All that awaits to be done in order to wind up the business

affairs of Treadegar is a final reconciliation and payment of the company's outstanding liabilities

and a distribution of the net proceeds of the Interpled Funds to the two interest holders.  In the

ordinary course, the Virginia Limited Liability Company Act provides that "the members may

wind up the limited liability company's affairs."  Va. Code § 13.1–1048(A) (2010).  Spain in her

pleadings has asked that she be appointed as a trustee in liquidation to effect this result.

---

[26] Spain produced records at Trial accounting for approximately $36,970.00 in total expenses, of which $22,174.10 was incurred after Sprouse left the Covenant Woods site on October 25, 2006.  Therefore, approximately $14,795.90 was incurred by Spain prior to this date and which the Court properly considers to have been expended on behalf of Treadegar.  Thaddeus Williams produced records at Trial accounting for $14,272.63 in expenses related to Treadegar.  The difference between these two figures is not substantial.

However, the simple procedure contemplated by the statute is unavailable in this case.  Spain and

Thaddeus Williams have each filed cases under Chapter 13 of the Bankruptcy Code, which cases

remain pending in this Court.   According to the Virginia Limited Liability Company Act, "a

member is dissociated from a limited liability company upon . . . the member's becoming a

debtor in bankruptcy."  Va. Code § 13.1–1040.1(6)(a) (2010).[27]  When a member is dissociated,

"the former member . . . shall continue to hold a membership interest and shall have the same

rights that an assignee of the membership interest would have."  Va. Code § 13.1–1040.2 (2010).

An assignee's membership interest is limited to "a member's share of the profits and the losses

of the limited liability company and the right to receive distributions of the limited liability

company's assets."   Va. Code § 13.1–1002 (2010) (defining "Membership interest" or

"interest").

Section 541(c)(1)(B) of the Bankruptcy Code provides that "an interest of the debtor in

property becomes property of the estate . . . notwithstanding any provision in an agreement,

transfer instrument, or applicable nonbankruptcy law—that is conditioned . . . on the

commencement of a case under this title."   11 U.S.C. § 541(c)(1)(B).   As Judge Mayer

concluded in *In re Garrison-Ashburn, L.C.*, 253 B.R. 700, 707 (Bankr. E.D. Va. 2000), "[t]here

is no question that the economic rights, that is the membership interest, becomes property of the

estate."  *In re Garrison-Ashburn, L.C.*, 253 B.R. at 707. [28]  In spite of any suggestion implicit in

Virginia law that the membership interest remains vested in the dissociated member upon the

---

[27]  The statute permits the articles of organization or operating agreement to provide otherwise, but neither exception applies in the case of Treadegar.

[28]  Judge Mayer was faced with the additional quandary of the effect of 11 U.S.C. § 365(c), (e) on the operating agreement of the company in *In re Garrison-Ashburn, L.C.*  As no operating agreement ever existed for Treadegar, the Court need not address the effect of those Bankruptcy Code provisions on the case.

filing of a bankruptcy case, § 541(c)(1) clearly controls.  The membership interests of Thaddeus Williams and Spain are now vested in their respective bankruptcy estates.

The Virginia Limited Liability Company Act provides that when a member is dissociated, whether due to bankruptcy or any other condition, the former member (or the former member's bankruptcy estate, per 11 U.S.C. § 541(c)) retains only the economic rights of this interest.  The former member does not retain any of the other rights inherent to membership, including the right to wind up the affairs of the company.  Va. Code § 13.1–1048 (2010).  Thus, in this case, there is no one remaining to wind up the affairs of Treadegar or to distribute the Interpled Funds.

Therefore, this Court will appoint a liquidating trustee to wind up Treadegar's affairs. Pursuant to the Virginia Limited Liability Company Act, on the application of any member, "the circuit court of the locality in which the registered office of the limited liability company is located, on cause shown, may wind up the limited liability company's affairs . . . and in connection therewith, may appoint one or more liquidating trustees." Va. Code. § 13.1–1048(A) (2010).  This Court stands in the stead of the Circuit Court, County of Prince George, Virginia due to the Notice of Removal filed July 14, 2010.  28 U.S.C. § 1447(a).  As the Parties have requested this Court to wind up the affairs of Treadegar and distribute the Interpled Funds, the Court has the authority under Virginia law to appoint a liquidating trustee for Treadegar.

The liquidating trustee that the Court will appoint shall (i) investigate the financial affairs of Treadegar, (ii) establish a procedure for the solicitation, filing, and examination of proofs of claim of Treadegar's creditors, (iii) determine whether there are any remaining assets of Treadegar in addition to the Interpled Funds that need to be liquidated, (iv) file any necessary actions to examine the judgments against the company and, if appropriate, to avoid any

judgments, (v) file any tax returns that Treadegar may be required to file, (vi) distribute the

Interpled Funds and any additional monies realized from the liquidation of Treadegar's other

assets to the creditors and interest holders of Treadegar after satisfying all expenses of

administration, and (vii) make a final report and file a final account of the administration of

Treadegar with the Court.  The liquidating trustee may take any other action he or she deems

appropriate subject to the further order of the Court.

IV

The remaining issue before the Court is the resolution of the claims by Defendants that

Plaintiff caused a loss of business opportunity for Treadegar and that Spain conspired with

Sprouse to injure Thaddeus Williams in his reputation, trade, or business.  In short, the Court

finds no basis for Defendants' claims.  Brendel testified that Haskell was not considering

Treadegar for any other significant work due to the company's small size.  In addition, Haskell

hired Thaddeus Williams' company, Williams Construction Services, LC, to perform trim work

on Covenant Woods after learning of the disputes between Spain and Defendants.  There is

simply no evidence supporting the Defendants' claims.

**Conclusion**

For the reasons stated above, the Court shall appoint a liquidating trustee for Treadegar to

wind up its financial affairs and to administer the Interpled Funds in accordance with this

Memorandum Opinion.  After all of the liabilities of Treadegar have been satisfied, the

remaining net proceeds from Treadegar's property shall be distributed, in equal portion, to the

trustees of the bankruptcy estates of Thaddeus Williams and Sandra Spain.  A separate order

shall issue.

ENTERED: _____


_____/s/ Kevin R. Huennekens_____
UNITED STATES BANKRUPTCY JUDGE